ROB BONTA, State Bar No. 202668
Attorney General of California
ALICIA BOWER, State Bar No. 287799
Supervising Deputy Attorney General
JAMES MATHISON, State Bar No. 149387
Deputy Attorney General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-6274
 Fax: (916) 324-5205
 E-mail: James.Mathison@doj.ca.gov
*Attorneys for Defendants*
*R. Hortizuela, K. Dacuycuy and D. Mutopo*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **HANIF S. ABDULLAH,**<br><br>                                    Plaintiff,<br><br>      v.<br><br>**DACUYCUY, et al,,**<br><br>                                    Defendants. | 2:19-cv-00804-TLN-DB (PC)<br><br>**DEFENDANTS' REPLY TO OPPOSITION TO THEIR MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: September 23, 2022<br>Time:           10:00 a.m.<br>Courtroom:  27<br>Judge:         Hon. Deborah Barnes |

**INTRODUCTION**

In their motion for summary judgment Defendants showed how they were not deliberately indifferent to Plaintiff's post-operative knee care needs, on undisputed facts supported by Plaintiff's medical records. In opposition to the motion Plaintiff asserts facts by way of his declaration that are contrary to and unsupported by his medical records and deposition testimony. These unsupported assertions should be disregarded. But even if they were accepted as true, there is still no genuine dispute regarding whether Defendants acted with deliberate indifference to a known and serious medical need—they did not.

1

Defendants' motion further showed how there is no genuine dispute on Plaintiff's deliberate indifference and negligence claims, because Plaintiff cannot establish causation. Plaintiff's opposition makes no arguments and presents no facts on the causation issue.

Additionally, for the negligence claim Plaintiff must show Defendants violated the professional standard of care, which requires a supporting expert's opinion or other medical support. In their motion, Defendants presented the opinion of a qualified nursing expert who found Defendants did not violate the standard of care. Plaintiff presents no expert's opinion or other medical support to rebut Defendants' expert, or to establish a violation—where it is his burden to do so in order to establish this necessary element of the claim. Nor does Plaintiff request the motion be continued to allow him to present an expert's opinions, which would be the appropriate response under Federal Rule of Civil Procedure 56(d), if Plaintiff intended to retain an expert to establish the matter.

Finally, Defendants' motion sought summary judgment, showing how they are shielded by qualified immunity. Plaintiff did not address that matter at all in opposing the motion.

For all of these reasons, the Court should grant summary judgment in favor of Defendants.

## ARGUMENT

**I.    THE DELIBERATE INDIFFERENCE CLAIM.**

In their summary judgment motion, Defendants presented as undisputed facts all of Plaintiff's documented encounters with prison medical staff, including themselves, from the time Plaintiff returned to the California Health Care Facility (CHCF) following his knee surgery at an outside hospital on July 16, 2018, through the time Plaintiff was sent back to the hospital for treatment of a knee infection on August 13, 2018. (Facts 2-38.) For all three Defendants, Plaintiff's knee bandage was noted to be clean, dry and intact each time they saw him, through the time CHCF physician Dr. Dredar saw Plaintiff on August 8, 2018, and ordered that the hospital-applied bandage could be removed. (Fact 29.) When he did so, Dr. Dredar noted that Plaintiff's surgical incision was healing well with the bandage on, Plaintiff denied any drainage or redness at his knee and stated he was feeling well with no concerns. (*Id.*) In addition to these facts about Plaintiff's care, qualified nursing expert R. Rada reviewed the records of Plaintiff's care,

and opined that all three Defendants acted within the standard of care in their encounters with Plaintiff. (Fact 39.) Based on these undisputed facts, which are supported by Plaintiff's medical records, Defendants moved for summary judgment on the grounds that there is no genuine dispute on Plaintiff's deliberate indifference claim, which is that Defendants' actions caused his knee dressing to become wet, leading to the infection. And further, nothing Defendants did or did not do constituted deliberate indifference to Plaintiff's medical needs concerning his post-operative knee care.

In opposition to the motion, Plaintiff submits his declaration concerning his post-operative encounters with Defendants and with CHCF physicians. The assertions presented in the declaration are stated to be made on Plaintiff's own personal knowledge, and not on any other source, such as his medical records. (ECF No. 55-1 at p. 2, ¶ 1.)  In the declaration, Plaintiff asserts matters that are not supported by, or are contradicted by, the medical records of Plaintiff's care. Further, the matters stated are contrary to Plaintiff's deposition testimony, where when asked to identify all of his interactions with Defendants, he did not describe the matters presented in his declaration. (See Exhibit A.)[1] In this situation, the Court should disregard the purported matters in Plaintiff's declaration. Self-serving and conclusory allegations with no support are insufficient to defeat summary judgment. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.").

For example, Plaintiff states that his hospital-applied bandage was removed by CHCF physician Dr. Son on or about July 30, 2018. (ECF No. 55-1 at p. 2, ¶ 5.) However, there is no medical record to support this encounter. The medical records do show that Plaintiff was seen by a CHCF physician on that date, Dr. Monivirin, who assessed Plaintiff's bandage as in place, with no redness of skin or leg swelling. (Fact 22.) The medical records further show that Plaintiff's hospital-applied bandage was not approved to be removed until CHCF physician Dr. Dredar saw Plaintiff and did so on August 8, 2018. (Fact 29.) At that time Dr. Dredar noted that Plaintiff's

---

[1] Exhibit A is a copy of excerpts of Plaintiff's deposition transcript in this case. The original transcript has been lodged with the Court in accordance with the Local Rules, and the excerpts may be verified as true copies by comparing them to the original transcript.

incision was healing well. (*Id*.). Given that Dr. Dredar found the incision site to be healing well on August 8, 2018, and that Plaintiff's bandage was noted to be clean, dry, intact (not removed) and with no signs of exudate on all dates before that (Facts 2-28), the records squarely contradict Plaintiff's declaration assertion that Defendants removed the hospital-applied bandage before Dr. Dredar approved removing it, such that Plaintiff could have expressed concern to Defendants that his incision site had dehisced (split open) on dates from July 31 to August 4, 2018, and that there were signs of yellow drainage and blood on the bandage thereafter. (Plaintiff's Declaration, ECF No. 55-1 at p. 2-5, ¶¶ 6-16.)

Plaintiff also asserts in his declaration that Defendants taped plastic garbage bags over his bandage and/or incision site for him to use while showering. Again, this is not supported by the medical records. Yet even if this were accepted as true, Plaintiff does not state that his bandage or incision site ever became wet from showering in this manner. (*Id*. at p. 2-5.)  Moreover, had Defendants done so, this action would negate a showing of deliberate indifference, rather than support it, as Defendants would have acted affirmatively to provide Plaintiff with the waterproof covering of his dressing that was directed by Plaintiff's hospital discharge order. (Fact 1.) The same would be true had Defendants directed Plaintiff to wash his incision site with soap and water to help keep it clean after his hospital-applied dressing had been removed, as Plaintiff asserts in his declaration. (ECF 55-1 at ¶¶ 13, 14, 17, 18.)

Other issues raised by Plaintiff in his opposition to the summary judgment motion are also without merit or consequence. First, Plaintiff raises what amounts to an incoherent argument about Defendants' attendance records as it relates to their post-operative encounters with Plaintiff. The bottom line is that Defendants presented their attendance records to show that they were not working on specified dates (Facts 44, 45) and therefore did not care for Plaintiff on those dates. Notwithstanding Plaintiff's arguments, he does not dispute that Defendants did not work on the particular dates, then adds in his response that Defendants did work on other dates (which obviously is correct). (ECF No. 55-3 at 28.)

Second, in his opposing declaration Plaintiff asserts that his incision site was photographed and measured by Defendants on various occasions, and argues that Defendants are withholding

records of this activity. To support this argument Plaintiff files with his opposition Defendants' responses to requests for admissions, contending that Defendants admitted that they photographed wounds and that the institution's practice was to photograph wounds. However, this is incorrect. Defendants admitted only that at the present time the practice is to photograph wounds, not at the time of Plaintiff's post-operative care over four years ago; and Defendants denied being aware of any photographs taken of Plaintiff's surgical wound. (ECF No. 55-2 at 44.)  Plaintiff also attaches the institution's medical supplies and equipment list for the medical wound management program, which lists as equipment digital cameras and wound measuring rulers, and argues that this shows Defendants are suppressing evidence that photographs and measurements were taken of his surgical wound. Yet that equipment list is dated January 2022 (ECF No. 55-2 at 60—upper left corner), which is consistent with Defendants' responses to the requests for admissions.

In summary, Plaintiff's opposition to the summary judgment motion does not raise a genuine dispute on the deliberate indifference claims in this action. Defendants were not deliberately indifferent, and the Court should grant summary judgment.

## II.   THE NEGLIGENCE CLAIM.

### A.   The Professional Standard of Care.

As set forth in the summary judgment motion, the necessary elements of a medical negligence claim under state law include the defendant's duty to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; and a breach of this duty. *Lattimore v. Dickey*, 239 Cal. App. 4th 959, 968 (CA 6th Dist. 2015). Healthcare providers are obliged "to possess and exercise, in both diagnosis and treatment, that reasonable degree of knowledge and skill which is ordinarily possessed and exercised by other members of [the] profession in similar circumstances." *Landeros v. Flood*, 17 Cal.3d 399, 408 (1976); *Johnson v. Sup.Ct. (Rosenthal)* 143 Cal. App. 4th 297, 305 (2006). The applicable standard of care is the "basic issue" in a medical malpractice action and is "peculiarly within the knowledge of experts" *Barris v. County of Los Angeles*, 20 Cal. 4th 101, 108 (1999); *Jameson v. Desta*, 215 Cal. App. 4th 1144, 1171 (2013).

In their summary judgment motion, Defendants showed how Plaintiff has no evidence to establish Defendants' duty or a breach of the duty. Defendants presented as undisputed the fact that Plaintiff's lay opinion that his knee infection was caused by Defendants' negligence is his alone, and that no medical professional has opined that the infection was caused by Defendants' negligence. (Fact 48.) Defendants further presented qualified nursing expert Rada's opinion that Defendants acted within the standard of care. (Fact 39.) Plaintiff's opposition presents no expert's opinion on the standard of care to rebut Rada's opinions, or to establish a violation of the standard of care, where it is Plaintiff's burden to do so in order to establish the necessary elements of a duty and breach of the duty for the negligence claim.

Plaintiff's only opposing argument on the expert standard-of-care issue is a reference to there having been no expert disclosures yet in this case, and to Defendants having so stated in objections included with their discovery responses. However, whether or not experts have been disclosed (or any reference to that matter by Defendants in discovery responses) in this case is irrelevant for purposes of the present summary judgment motion. Instead, the matter is addressed by Federal Rule of Civil Procedure 56. Plaintiff does not contend in his opposition that he intends to retain an expert who will present opinions on the professional duty of care and breach of the duty, but has not done so because expert disclosures are not yet due. But if this were the case, the appropriate procedure would have been for Plaintiff to file a declaration with his opposition describing the situation, and requesting that the summary judgment motion be continued until such time as Plaintiff could present the expert's opinions. Fed. R. Civ. P. 56(d). Plaintiff did not do so.

**B.    State Law Immunity.**

For the negligence claim, Defendants presented in their motion the immunity provided under California Government Code section 845.6, which provides that generally neither a public entity nor a public employee is liable for injury resulting from "the failure of the employee to furnish or obtain medical care for a prisoner in his custody." The motion also addressed the limited exception to the immunity "if the employee knows or has reason to know that the prisoner is in need of immediate medical care, and [s]he fails to take reasonable action to summon such

medical care" (*id.*), which has been narrowly construed to create a limited cause of action for a failure to <u>summon</u> immediate medical care only, and does not create liability for malpractice in furnishing medical care. *Castaneda v. Dep't of Corrs. & Rehab.*, 212 Cal. App. 4th 1051, 1070 (2013), *review denied* (May 1, 2013).

In his opposition, Plaintiff asserts that Defendants should have immediately summoned medical care when he expressed concern to them that his incision site had dehisced and there was yellow drainage and blood on his dressing,[2] <u>while they were already actually furnishing him care.</u> Plaintiff's claims in this action are that Defendants' actions caused him to develop an infection, not that they failed to immediately summon medical care for an infection that had already developed. (*See generally,* operative first amended complaint, ECF No. 25.) Thus Defendants are immune from liability under California Government Code section 845.6 for Plaintiff's negligence claim, and on that basis the Court should grant summary judgment.

### III.  CAUSATION.

As set forth in the summary judgment motion, in Eighth Amendment claims, a plaintiff must prove causation. *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988); *Estate of Brooks ex rel. Brooks* v. U.S., 197 F.3d 1245, 1248 (9th Cir. 1999). Plaintiff must establish personal acts by each defendant which show a direct causal connection to the violation at issue. *Sanders v. Kennedy*, 794 F.2d 478, 483 (9th Cir. 1986). If there is no affirmative link between a defendant's conduct and the alleged injury, there is no deprivation of the plaintiff's constitutional rights. *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976). Causation is also a required element that a plaintiff must establish for a state law negligence claim. *Lattimore*, 239 Cal. App. 4th at 968. Causation here requires a medical expert's opinion. *Barris*, 20 Cal.4th at 108; *Jameson,* 215 Cal.App.4th at 1171. A plaintiff's failure to produce an expert declaration or opinion showing that a defendant's actions were "highly likely to inflict the particular injury" renders summary judgment appropriate. (*Id.*)

---

[2] As set forth above, Plaintiff's declaration about his incision site having dehisced or otherwise shown signs of infection on the dates of these encounters with Defendants is contrary to the medical records and therefore should be disregarded. When disregarded there is no factual basis to support a failure to summon immediate medical care claim.

1    Having the burden to establish causation, and with the summary judgment motion showing that there is no evidence to establish it, Plaintiff's opposition does not address the causation issue. No argument or facts on the matter is presented. Therefore the Court should grant summary judgment.

The only reference Plaintiff has made in this action regarding causation is his complaint allegation that Defendants' acts and omissions allowed his surgical wound to become wet, causing the infection. (ECF No. 25 at 3.) Yet as set forth above and in the summary judgment motion, the medical records show that Plaintiff's hospital-applied bandage was clean, dry and intact at all times before the prison doctor approved removing it. (Facts 9-29.) Even under Plaintiff's unsupported and records-contradicting declaration version of events submitted in his opposition regarding his encounters with Defendants about showering with taped-on plastic garbage bags, the knee bandage/incision never got wet from showering. (ECF No. 55-1 at 2-6.)

Beyond the factual physical "wetness" issue for causation is causation from a medical standpoint, in terms of the pathology for the development of Plaintiff's infection. Absent a medical expert's opinion with supporting basis, causation for an infection as arising from the incision site becoming wet, or from contacting a plastic material (garbage bag), or from any other potential mechanism is pure speculation. Put simply, there is no evidence to establish causation in this case, and for that reason the Court should grant summary judgment.

IV.  **QUALIFIED IMMUNITY.**

In the motion for summary judgment Defendants set forth their entitlement to qualified immunity, and the authorities on which that entitlement is based. In particular, the inquiry focuses on whether it would be clear to a reasonable prison official that Defendants' conduct was unlawful in the situation confronted, so as to give "fair warning" to the official that their conduct was unconstitutional. *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) (citing *Hope v. Pelzer*, 536 U.S. 730, 731 (2002)). To overcome qualified immunity "existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (per curiam) (quoting *al-Kidd*, 563 U.S. at 741). And, Plaintiff bears the

burden of demonstrating that the constitutional right in question was clearly established at the time officials acted. *May v. Baldwin*, 109 F.3d 557, 561 (9th Cir. 1997).

Plaintiff, having the burden of demonstrating that Defendants' actions were "beyond debate" unconstitutional, presents no authorities to do so. Plaintiff does not even address the qualified immunity issue in his opposition to Defendants' motion. Therefore the Court should grant summary judgment as to Plaintiff's § 1983 deliberate indifference claims.

## CONCLUSION

For the reasons set forth above and in Defendants' summary judgment motion, the Court should grant summary judgment in favor of Defendants in this action.

Dated: September 1, 2022

Respectfully submitted,

ROB BONTA
Attorney General of California
ALICIA BOWER
Supervising Deputy Attorney General

*/s/ James Mathison*
JAMES MATHISON
Deputy Attorney General
*Attorneys for Defendants*
*R. Hortizuela, K. Dacuycuy and D. Mutopo*

SA2021302986
36489458.docx

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

HANIF S. ABDULLAH,

        Plaintiff,

vs.                              Case No. 2:19-cv-00804-TLN-DB (PC)

DACUYCUY, et al.,

        Defendants.

_____/

**CERTIFIED COPY**

DEPOSITION OF HANIF S. ABDULLAH

      The following deposition was given on May 6, 2022, commencing at the hour of 9:59 a.m., before Lisa A. Meeske, a Certified Shorthand Reporter, License Number 10617.

      The witness personally appeared at Cypress Court Reporting, Inc., 1011 Cass Street, Suite 100, Monterey, California 93940.

```
 1          Q.   Do you have any recollection of seeing a
 2   CHCF physician on August 8, 2018, with regard to your
 3   bandage, your incision site being assessed, and the doctor
 4   telling you that it could be removed?
 5          A.   No, I don't recall him telling me anything
 6   like that.
 7          Q.   Do you recall telling the physician that
 8   you were feeling well and had no concerns with regard
 9   to -- or when you saw him on August 8 of 2018?
10          A.   I don't recall that being August the 8th,
11   but I do recall seeing the doctor, and he asked me how I
12   felt.  I told him I didn't feel bad.  I felt okay.
13          Q.   Do you recall the date for that?
14          A.   It may have been August the 8th.
15          Q.   If we start from July 30th of 2018, when
16   you say that the bandage from the hospital was removed and
17   a new bandage was put on, you testified that that bandage
18   was put on by one of the three defendants in this case;
19   right?
20          A.   Yes.
21          Q.   Can -- can you identify for me your
22   encounters with any of the three defendants in this case
23   from July 30th, 2018, through August 13 of 2018.
24          A.   Yes.
25          Q.   Well, please identify your interactions
```

```
 1    with the defendants during that timeframe, what you
 2    recall.
 3           A.   I recall them coming looking -- taking the
 4    dressing that they put on.  They would look at it.  They
 5    would look at my -- look at the wound to see how it was
 6    doing.
 7           And, when I would go to them to take a shower,
 8    they would take off the old dressing.  Instead of putting
 9    a Band-Aid on, they would wrap it with a plastic -- with
10    the plastic.  After I would take the shower, they would
11    put a new dressing on.
12           And they would look at it periodically.  They
13    would come into my -- the dorm I was in, take the
14    dressing, look at the dressing, look at the wound to see
15    how it was doing, and that would be it.
16           That's my recollection.
17           Q.   And, when you say, "they," can you
18    differentiate between any of the three defendant nurses
19    who did what, when.
20           A.   No, I can't.
21           Q.   And, when you say that they put a new
22    dressing on, that would be at times after July 30th?
23           A.   Yes.
24           Q.   And, when -- when the defendant nurses
25    performed these activities that you just described, was
```

```
 1   with the three nurses, defendant nurses?
 2          A.   Yes.
 3          Q.   And have you described, to the best of your
 4   recollection -- strike that.  Let me ask you another
 5   question.
 6               You indicated that you couldn't tell which of
 7   the three defendants -- as between the three defendants,
 8   who did what, when.  Is that a correct statement?
 9          A.   I would have to say that I cannot pinpoint
10   the exact day who did what and when.
11          Q.   Right.
12               But, beyond the exact day, you can't say -- for
13   example, can you tell me that you recall, specifically,
14   that defendant Mutopo did -- did anything for you or to
15   you with regard to your right knee from July 18 to
16   August 13 of 2018?
17          A.   Yes.  I can say that Mutopo, she,
18   personally, would come in.  She, at times, would come in
19   and have the CNA under her supervision take the dressing
20   off.  Mutopo would look at it and then have the dressing
21   put back on, a new clean dressing put back on.
22          Q.   And you don't recall specific dates for
23   that; correct?
24          A.   No, I don't recall specific dates.
25          Q.   Do you recall how many times she did that?
```

1       A.   To tell the truth, no.
2       Q.   Maybe that was a figure of speech.  But I'm
3  looking for you to tell the truth throughout the
4  deposition.
5       A.   I know.  No, I can't.
6       Q.   Then same question for Nurse Hortizuela.
7            Do you recall, specifically, any interactions
8  that you had with her from July 18 through August 13,
9  2018?
10      A.   Yes.
11      Q.   Please tell me everything you can recall
12 about your interactions with her.
13      A.   I recall her coming into the -- coming into
14 the treatment area, treatment room; changing my dressing;
15 measuring it; taking -- taking pictures of it; having it
16 rewrapped on a number of occasions.  I can't say this day,
17 specifically, or that day, specifically, but I can say
18 that she did.
19      Q.   Anything beyond that with regard to your
20 interactions with her?
21      A.   I can recall, very specifically, I'm
22 thinking that she, on either the August the 11th or August
23 the 12th, came in and looked at the wound, changed the
24 dressing.  And she made a statement to the fact that the
25 wound was infected, or she looked at it and felt that it

```
 1   was infected and made note of it that it was draining.
 2        Q.   Anything else that you can recall with
 3   regard to your interactions with Defendant
 4   Nurse Hortizuela during this time from July 18 to
 5   August 13, 2018?
 6        A.   Not exact -- no.
 7        Q.   And it's correct to say that you're not
 8   aware of any witnesses who were present to observe and/or
 9   hear your interactions with Defendant Hortizuela; correct?
10        A.   That's incorrect.
11        Q.   How is that incorrect?
12        A.   Because there were CNAs or vocational
13   nurses that were in there, in the room, at the same time.
14        Q.   Okay.  But you can't tell me, as you sit
15   here today, what any of their names were; correct?
16        A.   No, sir, I can't.
17        Q.   That's because you don't know; correct?
18        A.   I don't know their names.  I only know
19   their faces.
20        Q.   And then, with regard to, since I didn't
21   ask you with regard to your interactions with Mutopo, is
22   it the same situation?  There were -- there were other
23   medical care staff present and/or observing, but you can't
24   tell me their names.
25        A.   Yes.  This is -- I was in prison.  That's a
```

```
 1    female?
 2         A.    More than one -- yes, one person in there.
 3         Q.    And then, just to cover the loop, as far as
 4    Defendant Dacuycuy goes, and I think you might have
 5    pronounced it differently.
 6         But do you understand that her last name is
 7    spelled D-A-C-U-Y-C-U-Y?
 8         A.    Yes.
 9         Q.    With regard to her, can you tell me
10    everything that you recall that she, specifically, did in
11    interacting with you from July 18, 2018, to August 13,
12    2018.
13         A.    Well, yes.
14         She also -- she also would come to the treatment
15    room and change my dressing or be there and have one of
16    the CNAs change a dressing, and she would look at the
17    wound.  Because she's a nurse, she would look at the
18    wound.  Because, with an open wound, the person who's the
19    nurse has to be there and has to do the dressing because
20    it's an open wound.  The CNAs can't do it because of the
21    rules that they just can't do if it's an open wound.  It
22    has to be done by the nurses.
23         Q.    Right.
24         But, specifically, for Dacuycuy --
25         A.    Yes.
```

```
 1          Q.   -- how many times did she do that during
 2   that timeframe, if you recall?
 3          A.   To tell the truth, I can't recall.
 4          Q.   You know it was, at least, one time,
 5   though?
 6          A.   At least once or twice.
 7          Q.   And you don't recall specific dates;
 8   correct?
 9          A.   Of course, no.
10          Q.   What injuries do you claim that you
11   sustained in this lawsuit?
12          A.   The injury to my right knee, the injury to
13   my -- potentially, to my heart, my infection.
14          Q.   Well, let me see if I can categorize your
15   injuries, and you tell me if this is correct or not.
16               So you went -- you were sent back to the
17   hospital on August 13th of 2018; correct?
18          A.   Correct.
19          Q.   And, when you were there on that occasion,
20   what did they do for you?
21          A.   First -- when I first got there on the
22   13th, they took me in a -- cut the wound.  They opened the
23   wound back up.  They tried to clean out the infection and
24   tissue that was infected, and they drained it.  Then they
25   put it back together.
```


# CERTIFICATE OF SERVICE

Case Name: **Hanif S. Abdullah (H00735) v. Dacuycuy, et al.**     No. **2:19-cv-00804-TLN-DB (PC)**

I hereby certify that on <u>September 1, 2022</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANTS' REPLY TO OPPOSITION TO THEIR MOTION FOR SUMMARY JUDGMENT**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>September 1, 2022</u>, at Sacramento, California.

| T. Oakes | /s/ T. Oakes |
|---|---|
| Declarant | Signature |

SA2021302986
36519931.docx